RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

AMERICAN FREEDOM LAW CENTER, INC.,

        *Plaintiff-Appellant*,

    *v.*

DANA NESSEL, in her official capacity as Attorney
General of Michigan; JOHN E. JOHNSON, JR., in his
official capacity as Director, Michigan Department of
Civil Rights identified on initiating document as
Agustin V. Arbulu,

        *Defendants-Appellees*.

No. 25-1684

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:19-cv-00153—Paul Lewis Maloney, District Judge.

Argued: March 19, 2026

Decided and Filed: August 14, 2026

Before: STRANCH, READLER, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellant. Kyla L. Barranco, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee Dana Nessel. Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee John E. Johnson, Jr. **ON BRIEF:** Robert Joseph Muise, AMERICAN FREEDOM LAW CENTER, Ann Arbor, Michigan, for Appellant. Kyla L. Barranco, Ann Sherman, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee Dana Nessel. Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee John E. Johnson, Jr.

    READLER, J., delivered the opinion of the court in which STRANCH and BLOOMEKATZ, JJ., concurred. READLER, J. (pp. 16–21), also delivered a separate concurring opinion.

---

**OPINION**

---

READLER, Circuit Judge.  Among a public official's many responsibilities is the need to communicate with her constituents.  In a representative democracy, the public expects its officials to highlight perceived problems and offer preferred solutions.  That dialogue, of course, sometimes leads officials to express views that cast others in an unfriendly light.  For better or worse, that is a natural product of our democratic system, where representatives are chosen from competing candidates with competing ideals.  It is hard to envision American political life working any other way.  *See Barr v. Matteo*, 360 U.S. 564, 571 (1959) (plurality opinion).

The American Freedom Law Center believes that Michigan's attorney general and its former civil rights director took that prerogative too far.  As American Freedom sees things, by citing a third party's reporting on hate groups in an official state press release—where that third party counts American Freedom among those groups—the two Wolverine State officials tarnished the law firm's reputation, an injury it says continues to hamper its First Amendment-protected activities.  American Freedom has pursued that grievance through a lawsuit against the two officials, seeking declaratory and injunctive relief.  After six years of litigation, the district court dismissed the action on the ground that American Freedom failed to produce evidence at summary judgment establishing its Article III standing to sue.  Because American Freedom has not demonstrated how defendants caused, or will cause, the law firm to suffer a cognizable injury, we affirm.

I.

Co-founded by attorneys David Yerushalmi and Robert Muise, American Freedom describes itself as "the Nation's first truly authentic Judeo-Christian, public interest law firm." R.80-9, PageID 1381.  In its "fight for faith and freedom," American Freedom "aggressively seeks" out opportunities "to advance and defend religious liberty, freedom of speech," and "our Nation's Judeo-Christian heritage" via litigation.  *Id.*

American Freedom's approach has attracted a few critics. They include the Southern Poverty Law Center (SPLC). With a philosophical bent different from American Freedom's, the SPLC depicts its mission as advancing civil rights and combating purported hate groups. In conjunction with those efforts, the SPLC publishes an annual Hate Map, which identifies organizations from state to state that the SPLC believes to be "hate and anti-government groups." *Hate Map*, S. Poverty L. Ctr., https://perma.cc/RT93-GW9X. In 2015, the SPLC formally labeled American Freedom as a Michigan-based anti-Muslim hate group. *Id.* American Freedom has been included on the Hate Map ever since. American Freedom, for its part, describes the SPLC as "America's premier leftwing smear group," using biased and derisive labels to undermine its political adversaries. R.80-12, PageID 1424.

That contentious backdrop set the stage for the events of February 2019, when the director of the Michigan Department of Civil Rights, Agustin Arbulu, and Michigan's attorney general, Dana Nessel, issued a joint press release "responding . . . to the release" of the SPLC's latest Hate Map. R.7-1, PageID 71. Citing the SPLC's hate classifications, the press release noted a purported increase in the number of active hate groups in Michigan. The release also contained an embedded hyperlink to the Hate Map. Arbulu deemed the uptick in hate groups "a troubling trend." *Id.*, PageID 71. Nessel in turn announced her office's formation of a "hate-crimes unit . . . to fight against hate crimes and the many hate groups" located in Michigan. *Id.* Along those same lines, Arbulu announced the development of "a process by which [his department] can document hate and bias incidents," including incidents that "are protected under the First Amendment and do not rise to a crime." *Id.*, PageID 71–72. The database, he added, would be used to "create targeted awareness and education programs to address and combat such incidents." *Id.*, PageID 72.

Although the press release did not mention American Freedom by name, news of the release made its way back to the law firm and its supporters. American Freedom claims it heard from donors who feared that the hate crimes unit would investigate American Freedom and expose its donors' identities. According to American Freedom, the *Detroit News* also reached out "for a comment regarding the announcement that 'Attorney General Nessel is going to be investigating' the SPLC designated hate groups." R.77-8, PageID 981–82. Not long thereafter,

the *Detroit News* published an opinion piece an American Freedom co-founder wrote criticizing Nessel for embracing the SPLC's designations and for targeting groups based on those labels.

Six days after the press release, American Freedom filed this § 1983 lawsuit against Nessel and Arbulu in their official capacities. Before describing the allegations therein, we note subsequent developments in the identities of the defendants. The Michigan Civil Rights Commission later terminated Arbulu for unrelated reasons. In the years that followed, the Department of Civil Rights employed two more directors, with defendant John Johnson now occupying Arbulu's place in the litigation.

Returning now to American Freedom's complaint, the law firm alleged that defendants have a "policy of targeting" groups like American Freedom "based on their political viewpoints" using the SPLC's "hate group" label as pretext. R.7, PageID 54. As for evidence, American Freedom pointed to the aforementioned press release, part of what American Freedom claimed was a "conspir[acy]" between defendants and the SPLC to suppress American Freedom's speech. *Id.*, PageID 55. As part of that suppression campaign, American Freedom asserted, defendants were poised to conduct "official investigations and surveillance" of all SPLC-identified hate groups in the state. *Id.*, PageID 58. Defendants' actions, the law firm concluded, had tarnished American Freedom's reputation, delegitimizing it in the eyes of "donors" and "potential clients." *Id.*, PageID 66.

As a legal matter, American Freedom dressed its case in First Amendment clothing. The complaint's primary theory was that defendants' acts are chilling its freedom of speech and expression by hindering its litigation activities. Although American Freedom also asserted a Fourteenth Amendment equal protection claim based on supposedly unequal treatment it received compared to politically favored groups, this claim was similarly tied to the notion that defendants were burdening American Freedom's First Amendment rights. As a remedy, American Freedom asked for injunctive and declaratory relief preventing defendants from "pejoratively labeling [American Freedom] as [a] 'hate' group[]," maintaining "files or databases containing information" about American Freedom, and sharing information with the SPLC or similar groups. *Id.*, PageID 65, 68–69.

Defendants responded in court and outside of it as well.  Out of court, Nessel authored a post on her official Facebook account challenging American Freedom to "[b]ring it" on while defending her efforts "to prosecute hate crimes and pursue organizations that engage in illegal conduct against minority communities."  R.77-2, PageID 928.  Later, Nessel clarified the approach being taken by her office, explaining in a *Detroit News* article that the hate crimes unit "will rely on more than just the SPLC list to determine wrongdoing," and will use its "own research and investigation in making a determination as to what organizations are operating as hate groups in this state."  *Id.*, PageID 930.  And during an appearance before the state senate, Nessel testified that she never intended to collaborate with the SPLC.  Finally, just over a year after it issued the disputed press release, the state removed the document from Michigan's government website under the state's archiving policies.  The press release can still be obtained through a request under Michigan's Freedom of Information Act, however, and it is also attached to the complaint, which American Freedom has posted on its public website.

In court, meanwhile, defendants moved to dismiss American Freedom's lawsuit due to a lack of standing and on the merits.  In line with Nessel's out-of-court comments, defendants argued that American Freedom's lawsuit distorted the press release.  Nessel asserted that she had no intention of investigating groups based on the SPLC's Hate Map, as her focus was on credible tips that could lead to prosecution of hate crimes.  Similarly, Arbulu maintained that the alleged database was to be used only to make outreach strategies, a proposal that died after Arbulu's termination and before it could be implemented.  For those reasons, defendants argued, American Freedom had no standing to sue or, at the very least, had failed to state a cognizable claim.

The district court disagreed.  Taking the jurisdictional issue first, the district court concluded that American Freedom had adequately pleaded standing because the press release gave the state's "imprimatur" to the SPLC's list of hate groups, thereby harming American Freedom's reputation.  R.35, PageID 644–45.  Turning to the merits, the district court, noting the limits on its consideration of fact questions at the Federal Rule of Civil Procedure 12(b)(6) stage, found itself unable to consider much of defendants' contrary evidence, and thus denied their motion to dismiss.

Following discovery, the parties filed dueling motions for summary judgment. The district court took some time to issue its decision. When it did, it ruled in favor of defendants. Although the district court had previously determined that American Freedom adequately pleaded standing for purposes of Rule 12(b)(6), it concluded at summary judgment that American Freedom failed to produce triable evidence of a cognizable injury in fact that was traceable to defendants. And even had American Freedom done so, the district court continued, the remedies identified in the complaint would not redress the law firm's claimed injuries. Accordingly, the court granted summary judgment to defendants on standing grounds. We turn now to American Freedom's appeal from that decision.

## II.

We review de novo the district court's grant of summary judgment for lack of standing. *Merck v. Walmart, Inc.*, 114 F.4th 762, 771 (6th Cir. 2024) (citing *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016)). We will affirm that result if, taking the evidence in a light most favorable to American Freedom, there is no genuine dispute of material fact and defendants are entitled to judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(a)).

A few words about standing to begin. The Constitution limits the federal judicial power to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. To satisfy that jurisdictional requirement, American Freedom must establish its standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). That means American Freedom, to obtain declaratory or injunctive relief from a federal court, must make three familiar showings. One, that it is either suffering an ongoing injury in fact, or is imminently likely to suffer an injury in fact. Two, that the injury likely will be caused by defendants. And three, that the judicial relief requested will likely redress any of its claimed injuries. *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1555 (2024) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *Lujan*, 504 U.S. at 560–61).

The standing elements have well-established definitions. "Injury in fact" refers to an injury that is both "concrete" and "particularized." *Id.* at 1556. "[C]oncrete" means the injury is "real, and not abstract," *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 340 (2016) (citation modified),

usually determined by reference to "harms traditionally recognized as providing a basis for lawsuits in American courts," *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (citation modified). "Particularized," meanwhile, requires that an injury affect the plaintiff "in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. In this setting, where the judicial relief sought (declaratory and injunctive relief) is forward looking, an injury in fact must also be "imminent" and "not speculative," so the harm "must . . . be likely to occur soon." *All. for Hippocratic Med.*, 144 S. Ct. at 1556 (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)); *see also Bannister v. Knox Cnty. Bd. of Educ.*, 49 F.4th 1000, 1017 (6th Cir. 2022) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–10 (1983)); *Mikel v. Quin*, 58 F.4th 252, 258 (6th Cir. 2023) ("Injunctions redress 'present ongoing' or 'imminent future' injuries." (quoting *Shelby Advocs. for Valid Elections v. Hargett*, 947 F.3d 977, 981 (6th Cir. 2020) (per curiam))). Put another way, when a plaintiff only requests forward-looking remedies, we regard past harms as "relevant only insofar as [they are] a launching pad for a showing of imminent future injury." *Murthy v. Missouri*, 144 S. Ct. 1972, 1987 (2024).

As for the critical element of "causation," a plaintiff's injury in fact must be "fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (citation modified). To that end, we consider "the line of causation between the illegal conduct and the injury." *All. for Hippocratic Med.*, 144 S. Ct. at 1557 (citation modified). The causal chain cannot be "too speculative." *Id.* (citing *Clapper*, 568 U.S. at 410–11). Nor can it be "too attenuated." *Id.* (citing *Clapper*, 568 U.S. at 410–11). Far off "ripple effects," even if predictable, do not support Article III standing. *Id.*

"Redressability" accounts for "the relationship between the judicial relief requested and the injury suffered." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021) (citation modified). If the requested relief "does nothing to redress the alleged injury," then we have no power to order it. *Mann Constr., Inc. v. United States*, 86 F.4th 1159, 1162 (6th Cir. 2023) (citing *California*, 141 S. Ct. at 2116). But if the asked-for remedy could at least partially redress an injury, even through nominal damages, the plaintiff has satisfied this element. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021).

Worth noting here is the fact that American Freedom's burden to demonstrate these elements adjusts "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. So in responding to defendants' summary judgment motion, American Freedom needed to "present enough evidence to create a genuine issue of material fact over each standing element." *Davis v. Colerain Township*, 51 F.4th 164, 171 (6th Cir. 2022) (citing *McKay*, 823 F.3d at 867–68). At this stage, "vague allegations about a future [injury] will not do." *Id.* (citing *Clapper*, 568 U.S. at 409; *Lujan*, 504 U.S. at 564).

With this backdrop in mind, we turn to the dispute at hand: whether American Freedom established standing for purposes of surviving summary judgment. Believing not, defendants primarily emphasize what they see as American Freedom's failure to meet the first two elements of standing. As defendants see things, American Freedom has not produced triable evidence that defendants will "cause[]" American Freedom to suffer an "injury in fact" in the future. *All. for Hippocratic Med.*, 144 S. Ct. at 1555. Before us, American Freedom responds by drawing our attention to the words of the press release itself, which it believes gives rise to three kinds of injuries sufficient for standing purposes—reputational, economic, and diversionary. To our mind, however, American Freedom comes up short across the board: It has not shown how its proffered reputational harm was caused by defendants, there is no material dispute of fact as to whether American Freedom suffered economic injury, and it forfeited its diversion of resources theory.

A. Start with reputational harm, American Freedom's principal theory. American Freedom theorizes that, because the February 2019 press release cited the SPLC's Hate Map report as evidence of a "troubling trend" that warranted the establishment of a "hate-crimes unit," R.7-1, PageID 71, defendants thereby "endorsed" the SPLC's selection of American Freedom as a hate group, R.77-8, PageID 985. By giving the SPLC's label "greater credibility and weight in the mind of the public," American Freedom says, defendants "exacerbated" the "reputational harm" caused by American Freedom's status as an SPLC-designated hate group. *Id.* And this reputational hit, the law firm adds, creates a chilling effect on its expression. Essentially, American Freedom posits that the press release had an "incremental effect . . . over and above" the reputational hit caused by the SPLC's existing designation, causing additional

reputational harm.  *Lebron v. Rumsfeld*, 670 F.3d 540, 562 (4th Cir. 2012) (quoting *McBryde v. Comm. to Rev. Cir. Council Conduct & Disability Orders of the Jud. Conf. of the U.S.*, 264 F.3d 52, 57 (D.C. Cir. 2001)).

Even if we assume that American Freedom suffered reputational harm by virtue of its designation as a hate group by the SPLC, it has not shown how defendants' press release caused incremental reputational injury.  Article III standing's "causation" element requires American Freedom to show "reputational harms flowing" from defendants' press release, not the SPLC's designation writ large.  *Turaani v. Wray*, 988 F.3d 313, 317 (6th Cir. 2021).  Measured by this standard, American Freedom's evidence falls flat.  For instance, American Freedom points to news articles acknowledging its status as an SPLC-designated hate group.  But these articles do not establish a causal connection to the press release.  Most predate the release; the others do not mention it.  So this alleged injury would be "fairly traceable" at most to the SPLC and its Hate Map, not defendants.  *Lujan*, 504 U.S. at 560 (citation modified).  And were that not enough, no article dates later than 2019, meaning the evidence gives virtually no insight into whether American Freedom will face reputational harm in the future.  *See Murthy*, 144 S. Ct. at 1987.

Nor does American Freedom argue that anyone called for or took action against the law firm based on the press release.  American Freedom, in other words, points to no specific third party who read the press release and "understood the defamatory significance" that American Freedom attributes to it.  *Freeman v. Ocwen Loan Servicing, LLC*, 113 F.4th 701, 710 (7th Cir. 2024).  It is not hard to see why.  The press release, remember, never mentions American Freedom by name; it includes only a text-embedded hyperlink to the SPLC's Hate Map.

Nor are we persuaded by American Freedom's assertion that defendants' press release gave their "imprimatur" to the SPLC's Hate Map, which again labels American Freedom a hate group.  That "imprimatur" does not leap off the page.  Defendants' citation to the Hate Map as evidence of a "troubling trend" indicates that defendants at most endorsed the "trend" identified by the SPLC and found the SPLC reliable enough to use as a source.  R.7-1, PageID 71.  But using the SPLC's work as a jumping-off point, contrary to American Freedom's narrative, does not equate to endorsing the SPLC's conclusions wholesale, let alone as to the SPLC's assessment

of American Freedom in particular.  And American Freedom has not put forth any contrary evidence showing that readers viewed the press release as promoting the SPLC's designation.

Resisting these conclusions, American Freedom emphasizes one instance where the *Detroit News* contacted the law firm after the press release issued "for comment regarding the announcement that 'Attorney General Nessel is going to be investigating' the SPLC designated hate groups."  R.77-8, PageID 981–82.  At most, this evidence reveals that a *Detroit News* reporter read the press release, consulted the SPLC's Hate Map, and saw American Freedom on the list.  But it does not suggest that the *Detroit News* or anyone else became more likely to perceive American Freedom as a hate group.  To the contrary, the *Detroit News* published an opinion piece by an American Freedom co-founder excoriating both Nessel and the SPLC for falsely labeling the law firm a hate group.  Thus, American Freedom cannot show how defendants' press release caused harm to its reputation, assuming that its reputation was, in fact, injured.

Even had American Freedom demonstrated that defendants caused it reputational harm when the press release first came out, that alone would not get the law firm across the standing finish line.  American Freedom, recall, cannot skate by on past harm alone.  *See Murthy*, 144 S. Ct. at 1993.  So in addition to showing that the press release harmed American Freedom's reputation in 2019, the law firm also must show that this injury will exist in the future.  *See Mikel*, 58 F.4th at 258.  American Freedom runs into trouble on that front too.

In general, "where reputational injury derives directly from an unexpired and unretracted government action," that harm presumably remains ongoing.  *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 711 (6th Cir. 2015) (quoting *Foretich v. United States*, 351 F.3d 1198, 1213 (D.C. Cir. 2003)).  But if that "government action" is "retracted or repealed," any "'lingering effects' on reputation . . . normally do not furnish a basis for Article III standing."  *Foretich*, 351 F.3d at 1214 (citing, *inter alia*, *McBryde*, 264 F.3d at 56–57); *see Sweet v. Cardona*, 121 F.4th 32, 43 (9th Cir. 2024).  At some point, the logic goes, such claims of bygone reputational harm become "too vague and unsubstantiated," effectively mooting the case.  *McBryde*, 264 F.3d at 57 (citing *Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636–37 (D.C. Cir. 2000)).  Taking all of this

into account, we consider whether defendants' press release could still cause reputational injury in the future.

It is difficult to believe American Freedom's purported past injury, even if it was caused by defendants, continues today. Consider defendants' post-release statements. Shortly after American Freedom filed suit, Nessel's spokeswoman explained in a *Detroit News* article that Nessel "will rely on more than just the SPLC list to determine wrongdoing." R.77-2, PageID 930. Weeks later, Nessel similarly testified before the state senate that she "at no point indicated that [she] would be working together with the [SPLC]." R.80-6, PageID 1369. In her words, "[t]hat's not something that I have ever said and it's not something that we plan to do." *Id.* Although not an explicit disavowal of the SPLC or its Hate Map, the words nevertheless undermine American Freedom's contention that the state fully agrees with the SPLC's methodology, undercutting the state's alleged "imprimatur." What is more, defendants represented to us that they do not intend to cite the SPLC in the future. Oral Argument Tr. 23:30–50, 27:00–28:05. Thus, even if American Freedom were right that defendants had endorsed the SPLC's hate group label, defendants "[]retracted" it. *Parsons*, 801 F.3d at 711 (citation modified).

True, as American Freedom argues, members of the public could theoretically view the press release going forward, notwithstanding any retraction. *See Rtskhiladze v. Mueller*, 110 F.4th 273, 277–78 (D.C. Cir. 2024). As a practical matter, however, the state took the press release down just over a year after its issuance in accordance with its ordinary record policies. So, to access the archived press release, members of the public would have to specifically seek out the document through Michigan's FOIA. And absent evidence that anyone would in fact do so, American Freedom can only speculate whether simply maintaining FOIA-accessible information in government files could cause future reputational harm. *See J. Roderick MacArthur Found. v. FBI*, 102 F.3d 600, 606 (D.C. Cir. 1996). At any rate, members of the public have no need for FOIA because American Freedom continues to make the press release available through its website. Thus, to the extent American Freedom believes the press release continues to cause reputational harm, that injury almost certainly is "self-inflicted." *Clapper*, 568 U.S. at 418.

Having established that the 2019 press release poses no risk of future reputational harm to American Freedom, that leaves only the possibility that defendants could make similar statements down the road.  Yet other than at our prompting, neither side addressed whether that possibility could preserve American Freedom's standing.  Given the six-year timespan since defendants took down the press release, and pairing it with defendants' apparent lack of intention to cite the SPLC again, that is perhaps unsurprising.  As such, we need not explore the issue here. *See Pavia v. NCAA*, 154 F.4th 407, 414–15 (6th Cir. 2025).

\*          \*          \*

To sum up:  American Freedom has not shown that the 2019 press release poses a risk of future reputational harm to the law firm.  Even accepting that the SPLC's hate group designation has harmed American Freedom's public stature over the years, it still does not establish how defendants' press release caused or added to that injury.  And even if it did in the days following its publication, we struggle to see how it could continue to cause harm seven years later.  For these reasons, American Freedom's reputational theory of standing fails on causation.

B.   American Freedom also claims that it suffers ongoing economic harm by way of decreased donor support.  According to American Freedom, the SPLC's "hate group" label— supposedly legitimized by the press release—"deters donors from supporting" American Freedom.  Appellant Br. 26.  Of course, that bare allegation by itself does not substantiate an injury in fact. *See Tenn. Conf. of the NAACP v. Lee*, 139 F.4th 557, 566 (6th Cir. 2025) (requiring "specific facts" (quoting *Somberg v. McDonald*, 117 F.4th 375, 378 (6th Cir. 2024))). American Freedom's theory, after all, cannot succeed if "it is not sufficiently predictable how third parties would react to government action." *All. for Hippocratic Med.*, 144 S. Ct. at 1557. And the factual support American Freedom offers on this score falls well short of the mark.

Turn to those examples now.  First, David Yerushalmi, American Freedom's co-founder, testified that following the press release, he received phone calls from donors expressing concern about the State of Michigan exposing their contributions to the law firm.  To be sure, fears of that kind could theoretically dissuade future donations.  Yerushalmi's testimony, however, never indicated that those callers threatened to stop donating to American Freedom, let alone fulfilled

that threat. And it appears they did not: American Freedom points to no evidence of donor trouble in the roughly seven years that have ensued following the press release.

Second, American Freedom highlights the fact that it was denied participation in AmazonSmile, a program that afforded Amazon customers the opportunity to donate part of their purchases to selected charities. True, Amazon did deny American Freedom access to the program based on the SPLC's hate group label. But the denial occurred in 2016, nearly three years before the press release. So that denial traces to the SPLC, not defendants. And as the AmazonSmile program no longer exists, there is no possibility of future harm in any event.

Third, American Freedom cites articles explaining how activist groups have at times pressured banks and payment processors to block donations to SPLC-listed hate groups. Perhaps that risk applies to SPLC-designated hate groups broadly. American Freedom, however, has not shown how its own de-banking is "certainly impending," *Clapper*, 568 U.S. at 409 (citation modified), let alone how that risk traces back to defendants, *see Lujan*, 504 U.S. at 560.

Fourth, American Freedom asks to supplement the record with data from 2017–2020 reflecting the number of American Freedom donors and amount donated during that period. At the outset, American Freedom offers no viable excuse for why it failed to marshal this evidence in district court. *See Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 477 (6th Cir. 2008). Even were we to consider the data, it fails to prove American Freedom's point. The law firm, the evidence indicates, received less money in 2019 than in previous years. But that discrepancy seemingly comes down to one large donor who scaled back contributions in 2019 and 2020 for reasons American Freedom does not endeavor to explain. At the same time, American Freedom saw more individual donors in 2019 than it ever had during the highlighted period. And however one evaluates this data, it cuts off in the first quarter of 2020, revealing very little about American Freedom's prospects today, roughly seven years later. All in all, American Freedom fails to substantiate economic harm—past, present, or future.

C.  Finally, American Freedom says that it has "suffered harm" because it must devote resources to "media releases, mailings, Internet postings, and *this* litigation" to mitigate its reputational damage. Reply Br. 11. This theory fails in several respects, starting with the fact

that American Freedom forfeited the argument by not raising it in its opening brief. *See Island Creek Coal Co. v. Wilkerson*, 910 F.3d 254, 256 (6th Cir. 2018) (citing *Golden v. Comm'r*, 548 F.3d 487, 493 (6th Cir. 2008)). Procedural issues aside, American Freedom's assertion has substantive flaws too. Consider the fact that American Freedom describes its injury here as incident to alleged reputational harm. As a result, were American Freedom to establish a reputational injury in fact, its diversion-of-resources injury brings nothing new to the table. And if American Freedom fails to show cognizable harm to its reputation, it cannot "manufacture standing merely by inflicting harm" on itself "based on . . . fears" of a reputational injury that is neither "ongoing" nor "certainly impending." *Clapper*, 568 U.S. at 416.

In any event, American Freedom does not put on a colorable diversion-of-resources theory. As the law firm seeks forward-looking relief, evidence of "past injury to its organizational resources" alone does not suffice. *Tenn. Conf. of NAACP*, 139 F.4th at 567 (citation modified). Likewise, in describing its future expenditures, American Freedom needed to give "concrete details" of how it will divert its resources. *Id.* (rejecting diversion theory because organization "did not identify any specific individuals . . . whom it planned to help"). To that end, Yerushalmi's declaration states that American Freedom "must spend money, time, effort, and other resources" using its "website, social media, [and] direct mailing" to combat the reputational hit. R.24-1, PageID 444. That conclusory allegation leaves us with few if any details as to what the law firm plans to do in the future. Not only that, add in the reality that apart from American Freedom's own say-so, the law firm fails to explain how those efforts ultimately detract from its regular activities. *See Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 631 (6th Cir. 2025) (generic allegation "that [defendant's] actions prevent [plaintiff] 'from engaging in its research, educational, and remedial activities'" are insufficient to survive summary judgment). Although American Freedom presumably diverts some resources to continue "*this* litigation," Reply Br. 11, maintaining a lawsuit cannot create an injury on its own. Otherwise, any plaintiff paradoxically could generate standing just by filing a lawsuit. *See Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011); *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n.3 (9th Cir. 2001) (collecting cases).

\* \* \* \* \*

We affirm.

———————————————

**CONCURRENCE**

———————————————

READLER, Circuit Judge, concurring.  The panel opinion arrives at the right conclusion for the right reasons.  An underlying issue that was the subject of extensive engagement by the parties throughout this appeal, however, garnered less attention than it perhaps deserved.  That is American Freedom's alleged reputational injury.

The panel opinion resolves this case on the ground that American Freedom failed to satisfy Article III standing's causation element.  As the panel opinion explains, American Freedom failed to introduce evidence of an injury specifically caused by defendants' 2019 press release.  To reach that outcome, however, we would typically also give attention to standing's "foremost" requirement:  "injury in fact."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).  After all, we could not say that defendants will not "cause" an "injury in fact" to American Freedom's reputation without having some threshold in mind for what counts as an "injury in fact."  *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1555 (2024); *see Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 302 (2008) (Roberts, C.J., dissenting) ("[T]he elements of standing" are "interlocking and related.").  With the panel opinion having implicitly assumed such a threshold without further explanation, I add a few words on how I understand the matter here.

1.  Begin with the parties' presentation of the issues, which frames the way we decide their case.  *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).  All agree that First Amendment litigants like American Freedom cannot gain standing based on "[a]llegations of a subjective 'chill.'"  *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).  That is because chill "typically constitutes the *reason* why the governmental imposition is invalid rather than the harm which entitled a party to challenge it."  *Morrison v. Bd. of Educ.*, 521 F.3d 602, 609–10 (6th Cir. 2008) (citation modified).  So while American Freedom alleges that defendants are chilling its freedom of expression, the law firm concedes that those allegations must come paired with a "specific present objective harm or a threat of specific future harm."  *Laird*, 408 U.S. at 13–14; *Morrison*, 521 F.3d at 609.

Beyond that initial point of agreement, however, the parties diverge on whether American Freedom has supplied enough evidence to that effect.  Defendants assert that American Freedom may not establish standing for its First Amendment theories based solely on an intangible loss of reputation.  Rather, they say, American Freedom must show that this reputational loss will manifest as tangible injuries, a showing defendants believe the law firm failed to make.  American Freedom, on the other hand, maintains that the term "hate group" has obvious pejorative weight, sufficient to be deemed defamatory per se.  For that reason, American Freedom contends it is enough to point to the harmful nature of the press release, without having to show special harm.  The parties devoted much of their briefing and oral argument time to sparring over this distinction.

At first blush, American Freedom appears to have the better of the argument.  The Supreme Court's decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), helps us understand how a party demonstrates a reputational injury in fact.  *See* 141 S. Ct. at 2208.  Analogizing to the common law tort of defamation, *TransUnion* explained that an injury in fact occurs "when a defamatory statement that would subject [a plaintiff] to hatred, contempt, or ridicule is published to a third party."  *Id.* (citation modified).  That formulation, it bears emphasizing, does not require a "readily quantifiable harm" to result from publication.  *Id.* at 2211.  As the Supreme Court acknowledged, American courts have traditionally recognized defamation per se, where "publication is generally presumed to cause a harm."  *Id.*  As such, a plaintiff can establish an Article III injury based on defamatory statements without showing "any *additional* or *tangible* harm."  *Fernandez v. RentGrow, Inc.*, 116 F.4th 288, 297 (4th Cir. 2024) (citing *TransUnion*, 141 S. Ct. at 2210 n.6).

But unlike today's case, *TransUnion* implicated neither the First Amendment nor the long-held rule against "subjective chill"–based standing.  *Laird*, 408 U.S. at 13.  That point bears noting, as controlling First Amendment cases could be read to set a higher bar than *TransUnion*.  Take, for instance, *Meese v. Keene*, 481 U.S. 465 (1987).  There, the Supreme Court held that a politician had standing to challenge the government's designation of films as "political propaganda."  *Meese*, 481 U.S. at 467–68.  But it based that holding not on the pejorative nature of the designation itself, but instead on data suggesting that the designation would harm the

politician's chances at reelection were he to exhibit the films as desired. *Id.* at 473–74. To a similar end is our decision in *Parsons v. United States Department of Justice*, 801 F.3d 701 (6th Cir. 2015). In *Parsons*, a group of civilians who identified as "Juggalos" challenged an FBI threat assessment that classified Juggalos as a gang. 801 F.3d at 706–07. We held that the plaintiffs had adequately pleaded standing because the Juggalos' label caused "concrete reputational injuries," subjecting the plaintiffs to "improper stops," "searches," "denial of employment," and the like. *Id.* at 712.

One could read these decisions, as do defendants, to imply that only tangible evidence of reputational harm can confer standing in cases like this one. That rule has some commonsense appeal. Uncharitable words undoubtedly hurt. But absent outward manifestations of that hurt, those words do little to move one's "subjective chill" into the realm of "objective harm." *Laird*, 408 U.S. at 13–14. That reasoning has led at least one circuit to conclude that the minimum showing to obtain "presumed damages of defamation *per se*" nonetheless "do[es] not establish a concrete harm sufficient" for "standing" in the First Amendment context. *Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011); *cf. Mezibov v. Allen*, 411 F.3d 712, 722 (6th Cir. 2005) ("[G]eneralized harm to character and reputation" fails to state a First Amendment retaliation claim on the merits.). Another court employed the same logic to rebuff a suit in which American Freedom pursued a strikingly similar theory against New York's attorney general. *See Miller v. James*, 751 F. Supp. 3d 21, 32–33 (N.D.N.Y. 2024) (citing *Zherka*, 634 F.3d at 646), *aff'd*, No. 24-2785, 2025 WL 1085815 (2d Cir. Apr. 9, 2025).

Measured by this more stringent standard, American Freedom's claim of reputational harm comes up short. The law firm does not appear to have introduced evidence of tangible reputational consequences that trace back to defendants. Indeed, as defendants point out, it is not obvious that American Freedom is being deterred from engaging in its expressive activities in the first place.

That said, defendants' reading of *Meese* and *Parsons* may not be the intended one. One might fairly question why we would require "a particular kind of injury" to "create standing for a particular kind of constitutional claim." *Carman v. Yellen*, 112 F.4th 386, 410 (6th Cir. 2024) (citing *Parsons*, 801 F.3d at 711–13) (citation modified). On that point, other courts have

reasoned that, while "harm to reputation" caused by a public official "may be sufficient to establish standing," that harm is not necessarily "enough to establish an abridgment of free speech rights" based on chilled expression. *Eaton v. Meneley*, 379 F.3d 949, 955 (10th Cir. 2004); *Kennedy v. Warren*, 66 F.4th 1199, 1206 (9th Cir. 2023) (finding standing based on "reputational injury" but concluding that such injury "is not itself a reason to prevent government officials from engaging in the rough and tumble of political debate"). Under that view, perhaps American Freedom's inability to point to tangible manifestations of reputational harm goes to the merits of the law firm's free speech claims, even if defamation per se could have given the law firm Article III standing to pursue them. And because, in this context, jurisdictional and merits issues are often susceptible to overlapping proof, that would explain why courts have tended to cast their reasoning under both frameworks. *Compare Zherka*, 634 F.3d at 646, *with Mezibov*, 411 F.3d at 722. At least to some extent, that reality seems to fuel the parties' disagreement over the proper evidentiary standard in this case.

2. For today's purposes, however, it is enough to note that American Freedom does not prevail even under its own view. The panel opinion assumes that American Freedom need only show that someone would view defendants' press release and "underst[an]d" its "defamatory significance." Panel Op. at 9 (quoting *Freeman v. Ocwen Loan Servicing, LLC*, 113 F.4th 701, 710 (7th Cir. 2024)). That corresponds to American Freedom's position that, as recognized in *TransUnion*, defamation per se can serve as an injury in fact.

That standard deserves some further elaboration. With *TransUnion* as the guiding light, a party need show only that a "defamatory statement that would subject him to hatred, contempt, or ridicule" has been "published to a third party." 141 S. Ct. at 2208. What must American Freedom do to hit that mark? As for the test's injury aspect, it falls on American Freedom to "show *how*" defendants' statements would tend to harm its reputation. *McNaught v. Nolen*, 76 F.4th 764, 772 (8th Cir. 2023) (citation modified). So while American Freedom need not prove a "readily quantifiable harm," *TransUnion*, 141 S. Ct. at 2211, it still needs to show with some specificity why the statements are defamatory. "Generalized allegations of reputational harm" are not enough. *Turaani v. Wray*, 988 F.3d 313, 317–18 (6th Cir. 2021) (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)). And as for the publication component, American Freedom

must show that a third party not only saw the statements at issue but also "underst[oo]d the defamatory nature of the communication." *Freeman*, 113 F.4th at 709 (quoting *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1154 (7th Cir. 2022)); *see TransUnion*, 141 S. Ct. at 2210 n.6 (defendant must have "brought an idea to the perception of another" (quoting Restatement of Torts § 559 cmt. a (A.L.I. 1938))).

Applying that standard here, the panel opinion rightly concluded that American Freedom has not put forth evidence sufficient to link any injury in fact to the 2019 press release. Yet the above articulation of the law exposes a wrinkle unexamined here. Recall, as the panel opinion notes, that we know of just one third party who saw the press release and connected it to American Freedom, the *Detroit News*. Given that defendants did not directly label American Freedom a hate group, but rather hyperlinked a SPLC webpage that did, we held that this fact alone did not create a genuine dispute of fact as to whether the *Detroit News* "understood the defamatory significance" of the press release. *Freeman*, 113 F.4th at 710.

Had American Freedom framed its arguments differently, it may have had better prospects of success. To determine what qualifies as an injury in fact, we ask whether the injury alleged "bears a 'close relationship' to a harm traditionally recognized as proving a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2208 (quoting *Spokeo, Inc. v. Robbins*, 578 U.S. 330, 341 (2016)). And at common law, "one who repeats or otherwise republishes defamatory matter is liable to the same extent as though he had originally published it." Restatement, *supra*, § 578. Under that rule, one could argue that, by disseminating a hyperlink to the SPLC's website to the *Detroit News*, defendants effectively republished the SPLC's designation of American Freedom as a hate group. Assuming, as the panel opinion does, that the SPLC's designation is defamatory, then perhaps American Freedom could trace a reputational injury back to defendants under the *TransUnion* standard after all.

Ultimately, however, American Freedom adopted a different theory of its case, one in which defendants' press release added to the law firm's existing injury by giving the State of Michigan's "imprimatur" to the SPLC's hate group label. As American Freedom did not take up this alternative theory, we rightly did not to take it up either. *See Sineneng-Smith*, 140 S. Ct. at 1579; *Pavia v. NCAA*, 154 F.4th 407, 414 (6th Cir. 2025). Yet with lively discourse dominating

No. 25-1684 *Am. Freedom Law Center v. Nessel, et al.* Page 21

today's political culture, another case like American Freedom's might not be far off, which in turn may bring resolution to this open question. *See Wright v. Spaulding*, 939 F.3d 695, 704 (6th Cir. 2019) (holding that where an earlier panel did not "consider and consciously decide" an issue, the matter remained open for resolution in a future case).